UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § § | |
| **Plaintiff,** | § § | **CRIMINAL NO.** |
| v. | § § § | **3:22-CR-378-N** |
| **RAYNALDO RIVERA ORTIZ,** | § § § | |
| **Defendant.** | § § | |

## MOTION TO RECONSIDER DETENTION ORDER

On September 19, 2022, the Honorable Magistrate Judge David Horan ordered Defendant Dr. Raynaldo Ortiz detained pending his trial on four counts related to alleged product tampering and drug adulteration. He respectfully moves this Court to reconsider that order of detention.

**I.   The governing statute privileges release over detention.**

Section 3142 of Title 18 allows a judicial officer to a release the defendant on personal recognizance, to release him or her on conditions, or to detain him or her. Subsection (b) instructs the judicial officer to order the defendant's release on his or own recognizance, "unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. 3142(b). And because the statute authorizes a range of conditions of release, it reserves detention for the case where there is not "any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. 3142(e). Finally, while a risk of non-appearance may be found by a preponderance of the evidence, "[t]he facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." 18 U.S.C. 3142(f).

When all of these provisions are taken together, it becomes clear that the statute evinces a strong preference for release over detention. *See United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992)("There can be no doubt that this Act clearly favors nondetention."). Indeed, "Congress envisioned the pretrial detention of only a fraction of accused individuals awaiting trial." *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985).

Section 3145(b) of the same Chapter permits a person ordered detained by a magistrate to seek reconsideration in the court having original jurisdiction, which motion must be resolved

promptly. This process is not review for error. Rather, this Court's decision on detention is "as unfettered as it would be if the district court were considering whether to amend its own action." *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir.1985); *accord United States v. Thibodeaux*, 663 F.2d 520, 527 (5th Cir.1981). Plenary review of the facts, considered in light of the factors enumerated at §3142, shows that the government did not meet its burden to justify detention.

**II. The reasoning of the Magistrate's detention Order is infirm.**

The Magistrate's Order relies exclusively on a finding that Defendant must be detained to ensure the safety of the community – it makes no suggestion that he presents a flight risk. *See* (Magistrate's Order of Detention ("Order"), at 3-4). That implicit conclusion is sound. The government produced nothing more on this count than a collection of vacation trips (the latest in 2016) to typical tourist destinations, *see* (Tr., at 66), and seven thousand dollars cash, *see* (Transcript of Detention Order ("Tr.") at 35). It showed no family or friends abroad, and no means of executing a long-term stay. See (Tr., at 60). Defendant is a longtime resident of the DFW area, whose loved ones reside right here. (Tr. at 71, 82, 96).

Instead, the order found that no combination of conditions could protect the public from further crimes of the defendant. *See* (Order, at 3-4). Again, however, that finding must be made on clear and convincing evidence, which is "evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Shafer v. Army & Air Force Exch. Serv.*, 376 F.3d 386, 396 (5th Cir.2004). Further, the defendant should be released on conditions if some combination of conditions would "reasonably assure" the safety of the community 18 U.S.C. 3142(e)(3). The "reasonable assurance" standard does not require a guarantee. This is because other than detention, "no other safeguard can 'guarantee' the avoidance of the statutory concerns." *Orta*, 760 F.2d at 892.

The evidence before the Magistrate did not meet the government's heavy burden. The Magistrate thought "that Defendant poses a specific threat and danger to continue to engage in – or to, in the future, engage in – violent retaliatory behavior against those who are involved in this investigation, even if released on restrictive conditions." (Order, at 4). In support, it referenced four considerations: 1) a 2016 conviction for cruelty to a non-livestock animal, 2) an incident in which Defendant "became angry at colleagues who insisted that he put on a facemask," 3) the fact that employees of the surgical center declined to speak to investigators, "expressing fear of what Defendant would do," and 4) the evidence presented about the instant offense, which, in the Magistrate's view "suggests that Defendant, apparently angry at recent professional disciplinary actions against him, tampered with IV bags at the surgical center." (Order, at 3-4).

These four considerations do not support a finding that Defendant will likely retaliate against witnesses while on pre-trial release. They certainly do not destroy any "reasonable assurance" of public safety, by "evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Shafer*, 376 F.3d 386, 396 (5th Cir.2004). Defendant addresses each in turn.

***The 2016 conviction***. In 2016, a jury found that Defendant shot his neighbor's dog with a pellet gun. *See Ortiz v. State*, 2018 WL 416495 (Tex. App. – Dallas 2018)(unpublished). The Magistrate thought this conviction reflected a risk of "violent retaliatory behavior," because "the Dallas Court of Appeals held that the evidence at trial supported a finding that Defendant had a motive to shoot his neighbor's dog because he was angry with his neighbor for her role in his breakup with his ex-girlfriend, including testimony in a protective order proceeding.'" (Order, at 3).

The state court opinion identified by the Magistrate, however, does not actually find that Defendant acted in retaliation for another's testimony against him. *See Ortiz*, 2018 WL 416495, at * 5. Rather, it named this one as one of many possible motives, including a longstanding frustration with the dogs' noise. *See id.* ("He had often mentioned wanting to shoot Bogdan's dogs as they barked when he arrived home. concluded that this possibility supplied a potential motive, and contributed to the evidence of guilt, a finding made on the remarkably forgiving sufficiency of the evidence standard."). Indeed, the neighbor's testimony against Defendant preceded the shooting by three months, though it did follow an argument between them more closely. *See id.* at *1-2. Notably, Defendant's retaliatory motivation was not an element of the offense, and was accordingly never found by a jury. *See* Tex. Penal Code Ann. § 42.092(b)(6). Further, any finding made by the state court of appeals flowed from the forgiving sufficiency of the evidence standard. *See Ortiz*, 2018 WL 416495, at * 1.

Defendant received 29 days in jail for this offense, which he served on weekends. *See* (Tr. at 58). The government produced no evidence that he absconded or avoided this sentence.

***The incident in which Defendant became angry with a colleague.*** The government produced evidence that Defendant once raised his voice to his colleagues and that he came into contact with their masks during the argument. *See* (Tr., at 28-29). The incident involved neither violence nor threatening language. *See* (Tr., at 28-29). A raised voice and a breach of personal space do not constitute threats to public safety.

***The unwillingness of witnesses to speak to investigators.*** The government elicited testimony from a case agent that "[t]here were two staff members who indicated that they were nervous to speak with us because they were afraid of what Dr. Ortiz would do to them." (Tr., at 28). The agent did not know, however, whether they feared that Defendant would affect their jobs, or whether they feared something worse, though one of them mentioned the mask incident above. *See* (Tr., at 52-53). Further, the government did not show whether these employees knew of the instant allegations, and simply reasoned that a person accused of such a crime might be dangerous, or whether, instead, they had some independent reason to fear him. A witness's reticence to speak to investigator is simply not a reliable basis to presume the likelihood of retaliation. People choose to avoid law enforcement contacts for all manner of reasons, not all of which can be laid at the feet of the accused.

***The evidence of retaliatory motive in the instant case.*** Nor did the government produce strong evidence of a retaliatory motive in the instant case. The detention order itself says merely that the evidence "suggests" such an "apparent[]" motive here.   (Order, at 4). An apparent

suggestion, however, is not proof by clear and convincing evidence. And if anything, the Magistrate's formulation overstates the evidence of motive presented at the detention hearing.

An agent testified that Defendant underwent a disciplinary inquiry at his facility because a patient experienced a blocked airway. *See* (Tr. at 18). That immediately preceded a cardiac event in another doctor's surgery, which the government wishes to identify with IV tampering. *See* (Tr. at 18). Defendant objected to the inquiry at work in strong language, saying he felt he was "being crucified." (Tr. at 18). But no statement or other evidence actually links the cardiac events to the disciplinary inquiry. There is only the coincidence of their dates. At some point, an elevated standard of proof requires more than a mere piling of inferences. *See United States v. Moreland*, 665 F.3d 137, 149 (5th Cir. 2011).

In the absence of this finding of likely retaliation, the case for detention dissolves. The alleged offense – tampering with IV bags – is singularly unamenable to repetition, at least where, as here, the alleged perpetrator lacks an active medical license. Defendant has a single criminal conviction, a misdemeanor, which did not involve a human victim. He cooperated in his arrest, without incident, which tends to contraindicate a rash or violent reaction to his current situation. *See* (Tr. at 58). He knows that the eyes of the city watch him attentively. *See* Jason Trahan, *et al*, *In jailhouse interview, North Dallas doctor denies he poisoned IV bags*, wfaa online (October 27, 2022), *available at* https://www.wfaa.com/article/news/local/investigates/dallas-dr-raynaldo-ortiz-interview-denies-he-poisoned-iv-bags-surgicare-north-dallas/287-7adabee7-16b5-445f-b45c-83fc52c7a49e . And the Court may fashion any number of restrictive conditions – up to and including an ankle monitor and no-contact orders – that would reasonably assure public safety.

### III. Independent review of the relevant factors supports release on conditions.

Review of the relevant factors set forth in §3142(g) confirms that release is appropriate. That Subsection calls on the Court to consider:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

    (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

These factors bend in favor of release.

   ***The nature and circumstances of the offense charged.*** As noted, the instant offenses would prove remarkably difficult to commit without an active medical license.

   ***The weight of evidence.*** A grand jury has indicted Defendant, but the case is hardly untriable. Defendant thus has every incentive to preserve his chances of prevailing at trial.

   According to the testimony of an agent, a surgical center where Defendant worked experienced a series of unexpected cardiac events (10) in four months. *See* (Tr. at 14). In one case, a doctor died after taking home an IV bag; the examiner ruled it Bupivaicane poisoning. *See* (Tr., at 13). Toxicologists examined an IV bag used in the surgery of one patient who experienced a cardiac event. *See* (Tr. at 8-9). They found three drugs with a tendency to produce such events: Linocaine, Bupivaicane, and Epinephrine. *See* (Tr. at 9). They also examined IV bags from a warmer[1] and found that two of the bags contained two of these drugs. *See* (Tr., at 9).

   The government also produced video evidence that Defendant placed IV bags in a warmer on three occasions shortly before a cardiac episode. *See* (Tr. at 12, 22-28). Each warmer, however, contains 20-40 bags, and on at least one occasion, ***staff restocked the warmer*** between the time the Defendant placed a bag in and the time of the surgery. *See* (Tr., at 28, 43). When staff restocks the warmer, they remove the old bags from the bottom of the pile. *See* (Tr. at 43). This raises doubts about whether the bag that went into a relevant surgery had been the one placed by Defendant. Indeed, the agent candidly acknowledged that he could not identify the bag that left the warmer and went into surgery as the same one that Defendant put into the warmer. *See* (Tr. at 51). Nor is there any video or eye-witness evidence that Defendant placed cardiotoxic drugs in any bag.

   The crux of the government's case, at least so far, is that Defendant put IV bags in a warmer, and some cardiac incidents have been linked to adulterated IV bags. This is not enough – it elicited testimony that doctors do not ordinarily put IV bags in the warmer, but usually permit staff to perform this task. *See* (Tr. at 45-46). But people act outside their job description all the time in busy workplaces; unusual behavior is not necessarily suspicious, much less conclusive.

   The government presented a few other coincidences, but none have much probative value. It showed that cardiac events did not occur in the brief period of Defendant's five-day vacation. *See* (Tr. at 20-21). But the suspicious cardiac events occurred ten times throughout four months. *See* (Tr. at 14). So a five-day pause carries little probative value. There have been many five-day pauses since these events began.

---

[1] An IV warmer increases the temperature of an IV bag so that the patient does not get chills when it comes into the vein at room temperature.

It also showed that officers found Lidocaine in Defendant's car. *See* (Tr. at 35). Analysts found Lidocaine – in combination with two other drugs -- in the IV bags. *See* (Tr. at 35). But the Lidocaine they found in the car was a topical gel for muscle pain, not something injectable. *See* (Tr. at 35, 59).

And the defense elicited significant countervailing evidence. The surgical center experienced five incidents in 2021 in which patients from the center required emergency medical transports during a procedure. *See* (Tr. at 38). Because nobody checked the IV bags in those cases, the government cannot exclude the possibility that the incidents began before the Defendant's ostensible motive. *See* (Tr. at 38). The Defense also showed that both the IV bags and the drugs are readily available to all staff. *See* (Tr. at 44).

At most, the government has produced evidence of suspicious coincidences. The weight of the evidence does not demand detention. Defendant has plenty to lose by running or reducing his chances at trial by illegal conduct.

### *The history and characteristics of the person.*

Defendant is a longtime resident of Dallas, (Tr. at 96), with no prior felony convictions. He is loved by family, who resides here in Dallas, (Tr. at 71, 82), maintains close friendships, (Tr. at 80), and values his good name.

***The nature and seriousness of the danger to any person or the community that would be posed by the person's release***. As shown above, the Magistrate's finding of danger to the community suffers from serious logical flaws. Again, if Defendant committed the charged offenses, he is not in a position to do so again. He knows he is carefully watched. He cooperated his arrest. *See* (Tr. at 58). Taken together, the evidence does not show a danger to the community, certainly not one proven under the applicable standards, and which cannot be mitigated by conditions such as an ankle monitor.

DATED: November 2, 2022.

Respectfully submitted,

/s/ *John Nicholson*
JOHN NICHOLSON
Assistant Federal Public Defender
Northern District of Texas
Texas Bar No. 24013240
525 Griffin, Suite 629
Dallas, TX 75202
(214) 767-2746 Phone
(214) 767-2886 Fax
John_nicholson@fd.org

# CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2022, I electronically filed the foregoing document using the Court's CM/ECF system, thereby providing service on attorneys of record.

/s/ *John Nicholson*
JOHN NICHOLSON