IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | NO. 3:22-CR-378-N |
| v. | |
| RAYNALDO RIVERA ORTIZ JR. | |

### GOVERNMENT'S BRIEF IN OPPOSITION TO
### DEFENDANT'S MOTION TO RECONSIDER ORDER OF DETENTION

The Court should deny defendant Raynaldo Rivera Ortiz Jr.'s ("Ortiz") motion to reconsider Magistrate Judge Horan's detention order. (Dkt. 28.) As the government will demonstrate in this filing and at the scheduled hearing, Ortiz—using his specialized medical knowledge—committed conscience-shocking, heinous crimes in which he indiscriminately poisoned patients at a medical center where he worked. The unique nature of this course of conduct demonstrates, almost all by itself, that Ortiz poses an intolerable risk to the public; a person who could both engineer and implement such a scheme—and evade detection for three months—should not be released. Moreover, he committed these crimes while he was supposed to be under close supervision and scrutiny due to multiple previous episodes of misconduct, strongly suggesting that conditions of release will not mitigate the risk Ortiz poses to the public.

Far from a close or marginal case for detention, as incorrectly suggested in the defense motion, all four of the Section 3142(g) detention factors—including the seriousness and nature of the offense conduct, the overwhelming weight of the evidence,

Ortiz's long and troubled personal and professional history, and the danger that Ortiz poses to the community—weigh heavily in favor of pretrial detention. Because the pretrial detention standard is amply satisfied, the Court should decline to reconsider the detention order.

## BACKGROUND

I.  **Factual Background**[1]

　　A.  **Ortiz's Significant History of Personal and Professional Misconduct**

Ortiz is an anesthesiologist who frequently provided medical services to surgical patients at Baylor Scott and White Surgicare North Dallas ("BSW North Dallas"). (Detention Hearing Transcript ("Tr.") at 17.)

In addition to domestic violence arrests in 1995 and 2014 that did not result in convictions, Ortiz had two emergency protective orders taken out against him by female companions—one in 2005 and one in 2015. (Detention Hearing Exhibits ("Hrg. Exs.") 1, 3.) Ortiz was also convicted by a jury in 2016 in Collin County of shooting his neighbor's dog. (Tr. at 29-30.) As the state appellate opinion recounts, Ortiz shot the dog around the time of a domestic incident in which his neighbor assisted Ortiz's girlfriend in leaving Ortiz and testified against him at a protective-order hearing. (*Id.*; Hrg. Ex. 2)

Ortiz also has a disciplinary history both with the Texas Medical Board and with medical facilities at which he has been employed. (Hrg. Exs. 1, 3, 4.) In November

---

[1] Additional factual information will be presented at the hearing the Court has set in this matter for Friday, November 18, 2022.

**Government's Brief in Opposition to**
**Motion to Reconsider Detention Order—Page 2**

2020, Ortiz was the anesthesiologist for a procedure Baylor Scott and White Surgicare North Garland ("BSW North Garland"), during which the patient suffered serious complications during anesthesia. (*Id.*; Tr. at 32-33.) In April 2021, in lieu of having his privileges revoked by BSW North Garland, Ortiz relinquished his medical staff membership and all clinical privileges at BSW North Garland. (*Id.*)

On August 19, 2022, Ortiz entered into an agreed order with the Texas Medical Board related to the November 2020 incident at BSW North Garland. (Tr. at 32-33.) The Texas Medical Board found that Ortiz "did not respond to the patient's issues in an appropriate manner," "failed to document the critical events," and "did not recognize the patient's inadequate oxygenation and ventilation." (Hrg. Ex. 4.) Ortiz agreed to several conditions, including submitting to extensive ongoing monitoring by a Board-selected physician at Ortiz's expense, re-taking a Medical Jurisprudence Examination given by the Texas Medical Board, completing 16 hours of continuing medical education credits, and paying a penalty of $3,000. (Hrg. Ex. 4.)

Yet another critical medical incident involving Ortiz occurred while the Texas Medical Board was considering the discipline discussed above. (Tr. at 17-18.) Specifically, in an incident on or around May 19, 2022, a BSW North Dallas patient, G.A., stopped breathing under Ortiz's care during a routine procedure. (*Id.*) The incident was under investigation at BSW North Dallas, and Ortiz expressed his dissatisfaction with the investigation to fellow staff. (*Id.* at 18.)

Ortiz failed to report these incidents to various institutions he worked for, despite obligations to do so. For example, Ortiz failed to notify Baylor Scott and White Medical

Center – Garland of his criminal charges. (*E.g.*, Hrg. Ex. 1.) Ortiz also failed to notify the Dallas Regional Medical Center—another facility where Ortiz did substantial amounts of work—of the Texas Medical Board investigation related to the November 2020 North Garland incident.

Additionally, Ortiz has engaged in multiple incidents of erratic and hostile workplace behavior. Ortiz engaged in multiple intense verbal altercations with surgical center staff at the Dallas Regional Medical Center—one of which became physical. (*E.g.*, Tr. at 28-29.) During one episode, Ortiz injected anesthesia drugs into a patient while he knew that security personnel were attempting to remove him. (*Id.*) Due to these events, among others, Ortiz has a poor reputation among staff at several of the facilities at which he works, and witnesses expressed concerns about Ortiz retaliating against them if they cooperated with this investigation. (*Id.* at 28, 104.)

### B. Ortiz Used His Specialized Knowledge to Cause the Death of a Fellow Doctor and a String of Severe Patient Injuries

M.K. was a doctor who worked at BSW North Dallas. On June 21, 2022, M.K. was at home treating herself for dehydration using an IV bag that investigators believe she had obtained from BSW North Dallas. (Tr. at 13.) Minutes after the IV bag was attached to M.K. intravenously, she experienced a major medical event and died before emergency medical personnel arrived on the scene. The medical examiner concluded that M.K. died of bupivacaine toxicity, and bupivacaine was found in her bloodstream. (Tr. at 13-14.) Bupivacaine solution is stocked at BSW North Dallas. (*Id.* at 12-13.)

On August 24, 2022, J.A., an 18-year-old male, was at BSW North Dallas for a surgery. During the surgery, unexpected complications arose when J.A. experienced a cardiac emergency. (*Id*. at 6-7.) J.A. was transferred to an emergency medical facility. (*Id*.) Physical inspection of the two suspected compromised IV bags found in BSW North Dallas's warmer (a device that increases the temperature of an IV bag to prepare it for use during surgery) following J.A.'s emergency medical event showed evidence of tampering, with small puncture holes in the clear plastic packaging that encase the IV bags. (*Id*. at 7-9.)

Scientists at the University of North Texas performed chemical testing of the IV fluid from the IV bag that was attached to J.A.'s arm when the adverse event began occurring. (*Id*. at 8-10.) That testing confirmed the presence in the IV bag of epinephrine, a pharmaceutical stimulant that could easily have caused the cardiac symptoms J.A. experienced if it had been administered intravenously. (*Id*.) The fluid in the IV bag also tested positive for bupivacaine and lidocaine. (*Id*.) The IV bag not labeled to contain epinephrine, bupivacaine, or lidocaine. (*Id*.)

After the incident involving J.A. and the autopsy report on M.K.'s death, BSW North Dallas personnel identified that the incidents involving J.A. and M.K. were likely not isolated and were likely part of a pattern of intentional adulteration of IV bags used for procedures at BSW North Dallas that caused cardiac emergencies. (*Id*. at 14.) BSW North Dallas personnel related that the incidents generally seemed to follow the same pattern in which a patient's blood pressure would spike to dangerous levels at some point during the surgery, usually after the placement of additional IV bags—as opposed to the

**Government's Brief in Opposition to**
**Motion to Reconsider Detention Order—Page 5**

IV bag initially given the patient in the pre-operative process. (*Id.* at 14-17, 39.) BSW North Dallas personnel said that medical staff were able to save the lives of these patients by using the "crash cart"—a set of emergency tools used when complications arise during surgeries—and by transferring the patients to emergency medical facilities. (*Id.*)

Cardiovascular incidents fitting this pattern, and involving suspected compromised IV bags, occurred on or around July 7, 15, and 18; and August 1, 4, 9, and 19. (Hrg. Ex. 5.) Ortiz was on vacation from on or around July 23 until on or around July 28, 2022. (*Id.*) No cardiovascular events occurred during the time he was on vacation, but the incidents started occurring again after he returned to BSW North Dallas from vacation on or around July 29, 2022; the first suspected incident thereafter occurred on or around August 1, 2022. (*Id.*)

### C. Surveillance Footage Confirms Ortiz's Involvement

Surveillance footage from BSW North Dallas's operating room hallway strongly indicates Ortiz's involvement in these events. (*Id.* at 21-22.) Surveillance footage exists dating from on or around August 2, 2022; the video in question was collected and reviewed by agents. (*Id.*)

Surveillance video shows that, on August 4, 2022 at or around 11:35 a.m., Ortiz exited Operating Room 5 and walked toward the warmer with an IV bag in his hand. (*Id.* at 22-28.) In the footage, Ortiz walked slightly past the warmer, then turned and quickly placed the IV bag into the warmer. (*Id.*) After he placed the IV bag in the warmer, he looked both directions in the OR Hall and then quickly walked away. (*Id.*) At or around 12:11 p.m., video shows a nurse obtaining an IV bag from the warmer for a surgery in

Operating Room 1.  (*Id.*)  After that IV bag was placed, a cardiac event occurred and the patient was transferred to an emergency facility.  (*Id.*)

On August 9, 2022, at or around 10:19 a.m., surveillance video shows Ortiz exiting Operating Room 5 with an IV bag in his hand.  (*Id.*)  Ortiz walked to the warmer and quickly placed the IV bag in the warmer.  (*Id.*)  At or around 10:54 a.m., a staff member exited Operating Room 4 and retrieved an IV bag from the warmer.  (*Id.*)  Medical records reflect that a cardiac event occurred shortly thereafter in Operating Room 4, and the patient was transferred to an emergency facility.  (*Id.*)

On August 19, 2022, at or around 10:34 a.m., surveillance video shows Ortiz exiting Operating Room 5 with an IV bag hidden under what appears to be a paper folder.  (*Id.*)  Ortiz walked to the warmer and appeared to swap the IV bag under the paper folder for a different IV bag in the warmer.  (*Id.*)  At or around 10:42 a.m., a staff member exited Operating Room 2 and retrieved an IV bag from the warmer.  (*Id.*)  Medical records reflect that the IV bag was administered to a patient in Operating Room 2 at or around 10:45 a.m., and that the patient in Operating Room 2 experienced a cardiac event shortly thereafter.  (*Id.*)  Emergency measures were employed, and the patient was transferred to an emergency facility.  (*Id.*)

## II.     Procedural History

On September 13, 2022, Ortiz was charged by criminal complaint in the Northern District of Texas with Tampering With a Consumer Product (causing death and/or serious bodily injury) in violation of 18 U.S.C. § 1365(a), and felony drug adulteration charges under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 333(b)(7); 331(k); 351(d).

Ortiz made his initial appearance on September 16, 2022, and the government moved to detain him pending trial. (Dkts. 3–4.) On October 5, 2022, Ortiz was subsequently indicted by a grand jury on five counts of tampering and five counts of adulteration. (Dkt. 17.)

***Detention Hearing.*** On September 19, 2022, Ortiz appeared before Judge Horan for preliminary and detention hearings. (Dkt. 11.) The government called FDA-OCI Special Agent Daniel Allgeyer, who testified to, among other things, the facts above that are cited from the hearing transcript. *See generally* Tr. at 4-36. Magistrate Judge Horan entered an order of detention, finding that the government carried its burden of showing, by clear and convincing evidence, that Ortiz "poses a specific threat and danger to continue to engage in—or to, in the future, engage in—violent retaliatory behavior against those who are involved in this investigation, even if released on restrictive conditions." (Dkt. 13 at 4.)

## LEGAL STANDARDS

In reviewing a magistrate judge's order of pretrial detention, this Court makes an "independent determination" on the issue of detention. *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992). The Court has discretion to supplement the magistrate judge's decision "with additional findings based on its independent consideration of the record before the magistrate and the additional evidence adduced before it." *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985).

The Bail Reform Act of 1984 authorizes pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the

appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).  Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  *See Fortna*, 769 F.2d at 249.  A finding that a defendant is a danger to the community must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f)(2)(B).  A finding that a defendant is a flight risk must be supported by a preponderance of the evidence.  *See United States v. Acosta-Leyva*, 751 Fed. Appx. 594, 595 (5th Cir. 2019).

The Court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's past conduct, criminal history, and probation status; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g).

## ARGUMENT

All of the Section 3142(g) factors weigh heavily in favor of Ortiz's detention.  The nature and circumstances of the offense shock the conscience, the weight of the evidence is strong, and Ortiz's personal characteristics amply illustrate the danger he poses to the community.  Because there is no condition or combination of conditions that reasonably mitigate those risks, this Court should uphold Magistrate Judge Horan's order and maintain Ortiz's detention pending trial.

***Nature and circumstances of the offense.***  The offenses charged here are heinous public-safety crimes where Ortiz—a physician who presumably took an oath to do no

harm—surreptitiously poisoned patients to the extent that life-saving measures were employed to stop them from dying. He did this repeatedly, inducing cardiovascular events with poisoned IV bags that he left in the IV bag warmer for his colleagues to use.

While the nature of the offense alone cannot be dispositive in this Court's detention determination, this factor overwhelmingly favors detention. Ortiz is an extraordinary danger to the public, and it is unclear what conditions could protect the public from the type of danger Ortiz poses if he were free. Surreptitiously poisoning IV bags was a novel way to commit a crime, and evidences remarkably depraved criminal creativity. Had Dr. Kaspar not unexpectedly taken a poisoned IV bag to her home and died, it is likely Ortiz would have evaded detection for far longer. The charges against Ortiz reflect that a dangerous person with extremely specialized knowledge who has access to dangerous substances can come up with novel ways to inflict harm.

*Weight of the evidence.* The weight of the evidence against Ortiz is overwhelming. The defense motion incorrectly attempts to downplay the government's case as built on "inferences." (Dkt. 28 at 4.) But this ignores the fact that Ortiz was caught red-handed on video inexplicably placing IV bags in the facility's warmer minutes before nurses took bags out of the exact same location—and then patients who were administered those bags experienced severe medical emergencies a short time after that. Being caught placing an instrumentality of a crime at the crime scene is direct evidence and does not require an "inference."

No one other than Ortiz placed random IV bags in the warmer with no logical explanation. No one other than Ortiz placed IV bags in the warmer directly before

medical emergencies. No doctor had any reason to put IV bags into the warmer at all. Emergencies occurred only after bags were used from the warmer where Ortiz placed bags; cardiac emergencies did not occur when Ortiz did not place bags in the warmer. Furthermore, Ortiz's remarkably furtive behavior surrounding his placement of the poisoned bags in the warmer speaks volumes. This is direct and persuasive evidence and logic, not "inferences."

For his part, Ortiz doesn't seem to disagree with large parts of the government's case, having said that the government's case is built on "partial truth" without describing what specific portion he believes is truthful. In a lengthy interview with the media conducted last month in which Ortiz voluntarily participated, Ortiz seemed to agree that the cardiac incidents at the medical center were unusual. And Ortiz did not dispute the existence of poisoned IV bags. Instead, Ortiz offered a number of alternative explanations for what happened at the center, most of which are contradictory and none of which actually explain what happened:

| Ortiz's Explanation | Reality |
|---|---|
| People cannot inject drugs into folded, sealed IV bags. | People can inject drugs into folded, sealed IV bags. |
| Surveillance videos do not show Ortiz taking drugs out of the local anesthesia cabinet. | Surveillance videos show Ortiz taking drugs out of the local anesthesia cabinet, and such drugs were also available in the operating rooms. |
| Ortiz believes another doctor at the surgical center is a "sex maniac" and a pedophile. | The doctor he mentioned did not place IV bags in the warmer. |

Government's Brief in Opposition to
Motion to Reconsider Detention Order—Page 11

Interestingly, Ortiz's motion does not offer these same explanations for the events at BSW North Dallas, but instead offers yet other explanations for the poisonings. None of those explanations fit the evidence either:

| Motion Explanation | Reality |
|---|---|
| "The surgical center experienced five incidents in 2021 in which patients from the center required emergency medical transports during a procedure . . . . [T]he government cannot exclude the possibility that the incidents began before the Defendant's ostensible motive." (Dkt. 28 at 4.) | The five emergency transfers in 2021 were varied and of a different character than the poisonings that Ortiz committed. Typical anesthesia or surgical complications involve low blood pressure or allergic reactions, not high blood pressure. |
| "The crux of the government's case, at least so far, is that Defendant put IV bags in a warmer, and some cardiac incidents have been linked to adulterated IV bags." (Dkt. 28 at 4.) | Ortiz surreptitiously put an IV bag in the facility's warmer, and came back in a furtive manner to "check" on a bag he just placed there; minutes later, a nurse took a bag from the same location; minutes after that, a patient experienced a medical emergency. |

***History and characteristics of the defendant.***  As noted above, Ortiz has a lengthy history of personal and professional misconduct including violence, as well as a criminal conviction that involves retaliating against a witness. The fact that Ortiz was under close scrutiny and supervision by regulators at the time of the current offense indicates both his likely inability to comply with conditions of release and his lack of respect for the law. Ortiz also has a troubling history of failing to report his misconduct to the facilities where he worked, which further underlines his likely inability to comply with conditions of release.

*Danger to any person or the community.* Section 3142(g)(4) requires the court to consider not only the danger to the community but also "the nature and seriousness of the danger to any person . . . that would be posed by the person's release." The nature of the offense conduct, Ortiz's criminal history, Ortiz's medical expertise, and Ortiz's history of surreptitious, retaliatory, and/or violent attacks make strikingly clear that Ortiz is a danger to the community and there are no conditions of release that reasonably mitigate that danger.

Ortiz's motion fails to grapple meaningfully with any of these issues, suggesting that his lack of a medical license makes Ortiz poisoning people "singularly unamenable to repetition." (Dkt. 28 at 4.) But, of course, a medical license is not required to poison people or retaliate against witnesses—and Ortiz has proven that he is proficient at doing both. In terms of poisoning people, Ortiz has access through his business and his connections in the medical industry to the same or similar tools he used to commit his crime. Ortiz's motion does not propose any conditions that could mitigate the risk that Ortiz will offend again using even more surreptitious means—because there are no such conditions.

And in terms of retaliating against witnesses, the defense motion incorrectly describes his conviction for shooting his neighbor's dog as "not involv[ing] a human victim." (Dkt. 28 at 4.) As an initial matter, the defense motion is wrong because shooting a person's pet obviously victimizes the owner of the injured animal. But, more importantly, the defense motion gets it entirely backward. No one reading Judge Ada Brown's opinion in Ortiz's criminal case could miss what happened—Ortiz shot his

neighbor's dog after his neighbor helped Ortiz's live-in girlfriend *escape from Ortiz's acts of domestic violence* and after his neighbor *testified against Ortiz* at a protective order hearing. *Ortiz v. State*, No. 05-16-00817-CR, 2018 WL 416495, at *5 (Tex. App. Jan. 16, 2018). There is no way to mitigate against the risk of Ortiz resuming and escalating these types of behaviors given his current situation, and the overwhelming evidence indicates that witnesses are fearful of what Ortiz will do upon release.

In sum, all four factors strongly favor detention. Ortiz's crime and his history are too clearly dangerous and problematic to allow Ortiz the opportunity for mischief while awaiting trial. He should remain detained.

## CONCLUSION

For the foregoing reasons, the Court should not reconsider or alter Magistrate Judge Horan's detention order.

Respectfully submitted,
CHAD MEACHAM
ACTING UNITED STATES ATTORNEY

JOHN J. DE LA GARZA
Assistant United States Attorney
Texas State Bar No. 00796455
1100 Commerce Street, Suite 300
Dallas, Texas 75242
214-659-8838

 *s/ Patrick R. Runkle*
PATRICK R. RUNKLE
Senior Litigation Counsel
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386
202-532-4723

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing will be served on counsel for the defendant via electronic mail on the 16th day of November, 2022.

*/s/ Patrick R. Runkle*
Patrick R. Runkle
Senior Litigation Counsel