IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RAYNALDO RIVERA ORTIZ JR. | NO.  3:22-CR-378-N |

### GOVERNMENT'S NOTICE OF
### EVIDENCE POTENTIALLY RELEVANT TO RULE OF EVIDENCE 404(b)

The government provides notice that it may introduce evidence at trial regarding acts that are intrinsic to the crimes charged or are otherwise admissible under Federal Rule of Evidence 404(b).  As set out below, some of these acts arose out of the same series of events as the charged offenses, are inextricably intertwined with the evidence regarding the charged offenses, and are necessary to complete the story of the charged crimes.  Evidence of the acts described below also would be admissible pursuant to Federal Rule of Evidence 404(b).

### Factual Background

The charges in this case stem from the defendant tampering with and contaminating medical IV bags used in surgical procedures at Baylor, Scott, & White Surgicare North Dallas facility ("BSW Dallas").  Dkt. 17 at 6.  The indictment generally alleges that the defendant tampered with a consumer product causing serious bodily injury and intentionally adulterated a drug having a reasonable probability of causing serious adverse health consequences by injecting adulterants into the IV bags of saline solution. *Id.* at 6-7.

Government's 404(b) Notice – Page 1

As alleged in the indictment, multiple incidents of cardiac emergencies occurred at BSW Dallas between May and August 2022 during otherwise routine surgeries. *Id.* at 3. The incidents occurred shortly after an IV bag from the "warmer"—a small refrigerator-sized device that warms IV bags for surgery—was attached to the patient via a tube with a needle inserted into the patient's vein. *Id.* at 4. On or about August 25, 2022, hospital staff discovered two IV bags in the warmer with small puncture holes in their outside wrappers. *Id.* at 5. Chemical testing of the liquid in those IV bags revealed the presence of pharmaceutical adulterants that are not ingredients included in lactated ringer's IV solution. *Id.* Surveillance videos show the defendant surreptitiously and inexplicably placing IV bags in the facility's warmer minutes before nurses took bags out of the same warmer and administered them to the patients who experienced cardiac emergencies. Dk. 16 at 21-22.

Ortiz was a licensed anesthesiologist who, since the 1990s, had frequently provided medical services to surgical patients at BSW Dallas and other surgical facilities in the area. *Id.* at 1. In 2016, Ortiz was convicted of shooting his neighbor's dog, a violation of Texas animal cruelty laws. Also in 2016, BSW North Garland, one of the surgery centers at which Ortiz practiced, suspended Ortiz for 14 days for failing to disclose his arrest on the animal-cruelty charges to the center. In 2018, the Texas Medical Board instituted disciplinary proceedings against Ortiz based on his failure to disclose his criminal conviction to the Board. The Board eventually imposed discipline, including a public reprimand, a fine, a series of disclosure requirements, and a

requirement to adhere to professional obligations, as well as the Texas Medical Practice Act.

Then, in November 2020 at BSW North Garland, Ortiz committed a grave medical error that resulted in a serious patient injury. Days after that incident and then again days after the hospital opened an investigation into the incident, medical professionals at BSW North Garland noted unusual medical complications during which patients in the pre-operative area experienced extreme hypertension and tachycardia after being attached to IV bags prior to their surgeries.

Instead of facing BSW North Garland's internal disciplinary process for his conduct in the November 2020 incident, Ortiz voluntarily relinquished his privileges at BSW North Garland in April 2021—but was still subject to pending disciplinary proceedings before the Texas Medical Board related to the same medical error.

Then, in May 2022, just days before the cardiac emergencies described in the indictment began occurring at BSW Dallas and while the Board's investigation into the November 2020 incident was still ongoing, Ortiz committed yet another grave medical error that resulted in a serious patient injury at BSW Dallas. Ortiz quickly found himself again under investigation—this time by the Medical Executive Committee at BSW Dallas. By this time, revenue for Ortiz and his anesthesia and billing businesses had been in decline, Ortiz owed millions of dollars in back taxes (but continued to spend money profligately), and BSW Dallas was Ortiz's primary source of income. The poisonings at BSW Dallas began just days after Ortiz discovered he was the subject of this new disciplinary proceeding.

Notably, the Texas Medical Board proceeding against Ortiz based on the 2020 incident at BSW North Garland was still pending at the time of nearly all the events described in the indictment.  On August 19, 2022, the same day Ortiz poisoned victim K.P. with an IV bag at BSW Dallas, the Texas Medical Board issued an order finding that Ortiz "did not respond to the patient's issues in an appropriate manner," "failed to document the critical events," and "did not recognize the patient's inadequate oxygenation and ventilation."  In the order, Ortiz agreed to several conditions, including submitting to extensive ongoing monitoring by a Board-selected physician at Ortiz's expense, re-taking a Medical Jurisprudence Examination given by the Texas Medical Board, completing 16 hours of continuing medical education credits, and paying a penalty of $3,000.

## Proffered Evidence

As relevant to Rule 404(b), the government may elicit testimony or present the following categories of evidence, each of which is described in more detail below:

1. Documents from earlier disciplinary actions that include the fact of a prior conviction and Ortiz's failure to report that conviction;

2. Ortiz's 2020 and 2022 medical errors, including documents from disciplinary proceedings involving those medical errors that were pending at the time of the crimes in the indictment;

3. Ortiz's failure to pay federal income and state property taxes;

4. Two prior similar poisonings at BSW North Garland that occurred under the same general circumstances as the BSW Dallas poisonings;

5. Multiple other cardiac incidents at BSW Dallas and the death of Dr. Melanie Kaspar in June 2022 due to bupivacaine poisoning.

## Relevant Law

"'Other act' evidence is 'intrinsic' when the evidence of the other act and evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged." *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990); *United States v. Kloock*, 652 F.2d 492, 494-95 (5th Cir. 1981). Such evidence "is admissible so that the jury may evaluate all of the circumstances under which the defendant acted." *United States v. Randall*, 887 F.2d 1262, 1268 (5th Cir. 1989). Intrinsic evidence does not implicate Rule 404(b), and consideration of its admissibility pursuant to Rule 404(b) is unnecessary. *United States v. Coleman*, 78 F.3d 154, 156 (5th Cir. 1996).

Federal Rule of Evidence 404(b) provides that evidence "of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)-(2). As courts have routinely stated, Rule 404(b) is a "rule of inclusion." *United States v. Andersen*, 374 F.3d 281, 288 (5th Cir. 2004). In other words, a court may admit prior crimes or bad acts evidence if it is "relevant for any purpose other than proving the defendant's propensity to commit crimes." *United States v. Gutierrez-*

*Mendez*, 752 F.3d 418, 423 (5th Cir. 2014).  This is known in the Fifth Circuit as the first part of the two-part *Beechum* test.

Evidence admitted pursuant to Rule 404(b) must also "possess probative value that is not substantially outweighed by its undue prejudice" under Federal Rule of Evidence 403.  *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978).  In performing this second part of the *Beechum* test, "the task for the court . . . calls for a commonsense assessment of all the circumstances surrounding the extrinsic offense."  *United States v. Richards*, 204 F.3d 177, 200 (5th Cir. 2000).  The risk of unfair prejudice is substantially lowered by a district court's limiting instruction.  *United States v. Crawley*, 533 F.3d 349, 355 (5th Cir. 2008).

## Argument

Ortiz's motive and intent will be key areas of contention at the upcoming trial.  Due to the unique circumstances of the crimes charged in the indictment and the considerable trust the public puts in medical professionals, the government must be able to convey to the jury the circumstances under which Ortiz acted and the motives he had for doing the unusual acts alleged in the indictment.  Put simply, the government is entitled to explain to the jury, using competent evidence, *why* a licensed physician would transform from someone who treats patients into someone who hurts them.

The evidence in this notice is admissible in two ways.  First, the evidence is inextricably intertwined with the charged offenses and provides background information to complete the story of the charged offenses.  Alternatively, the evidence is admissible

pursuant to Federal Rule of Evidence 404(b), as it proves a common plan or scheme and proves the defendants' motive, knowledge, intent, and absence of mistake or accident.

### 1. Documents from earlier disciplinary actions that include the fact of a prior conviction and Ortiz's failure to report that conviction

As described above and as the government plans to present at trial, in the years leading up to the events at issue in the indictment, Ortiz was the subject of multiple disciplinary proceedings: a 2016 investigation by BSW North Garland, a 2018 investigation by the Texas Medical Board, a 2020-21 investigation by BSW North Garland (which led to Ortiz resigning his privileges there), and a 2021-22 investigation by the Texas Medical Board (which was still pending at the time of the crimes in the indictment).

These investigations by themselves had already put Ortiz's medical license, his privileges, and his employment as a physician—his primary source of income and the only way he could fund his opulent lifestyle—at risk. As the government plans to present, when Ortiz committed the subsequent medical error at BSW Dallas on May 19, 2022 and the Medical Executive Committee there quickly began yet another investigation, the situation was extremely grave for his future both as a doctor and, by extension, as a wealthy individual. The series of poisonings charged in the indictment began just days later. Hence, as the government plans to show, Ortiz's motive was to take revenge on the medical center and on the people whom he believed were unfairly investigating him—by surreptitiously hurting their patients and by causing chaos at BSW

Dallas, while simultaneously attempting to deflect attention from his own medical errors by making sure that he did not poison any of his own patients.

As to this first category of disciplinary evidence, the government plans to present evidence and testimony that Ortiz failed to disclose to BSW North Garland and to the Texas Medical Board his 2016 conviction for shooting his neighbor's dog. The government recognizes that, for the purposes of affirmative Rule 404(b) evidence in the government's case-in-chief[1], disclosing to the jury that Ortiz shot his neighbor's dog could carry the risk of undue prejudice. Hence, the government proposes redacting the documents at issue to identify only that Ortiz was disciplined for failing to report a criminal conviction; a proposed redacted Texas Medical Board document is attached as Exhibit A.

As the first dominos to fall in the snowballing disciplinary proceedings against Ortiz that continued until the time of the crimes charged in the indictment, the disciplinary proceedings in 2016 and 2018 are critical indicators of Ortiz's intent and motive in committing the acts charged in the indictment, and are proper evidence of motive, knowledge, and intent that should be admitted under Rule 404(b). As to Ortiz's intent and motive, the jury is entitled to hear not just that Ortiz was subject to one pending disciplinary proceeding at the time of the crimes charged in the indictment, *see infra*, but also that he was the subject of multiple, cascading investigations that made the

---

[1] The government reserves the right to seek admission of Ortiz's conviction for shooting his neighbor's dog—as well as other aspects of his history, including multiple domestic-violence issues—through any other viable theory, such as the defense opening the door to its admission by arguing that Ortiz is a peaceful person or a person of good character.

**Government's 404(b) Notice – Page 8**

May 2022 incident all the more dangerous to his future as a doctor and gave him all the more reason to cause chaos at the surgical center—as well as to make it appear as if there were systemic problems at the center unrelated to Ortiz.

As to Ortiz's knowledge, the government also plans to present evidence about how rare disciplinary actions against doctors are—roughly 30 Texas doctors per year are disciplined out of more than 90,000 doctors—further underscoring the unusual nature of Ortiz's problems and his motivation to avoid future discipline. The government is entitled to tell the full story of the crimes charged in the indictment and explain Ortiz's motive by informing the jury that Ortiz, unlike the vast majority of other doctors, was under an extremely heightened risk of losing his privileges and/or medical license due to escalating discipline, which includes the story of the earlier discipline proceedings.

There is little to no risk of undue prejudice as to this evidence because disciplinary proceedings against Ortiz due to failure to report a criminal conviction are not "highly prejudicial" or "incendiary," nor are they "of a heinous nature," and this proposed Rule 404(b) evidence of other wrongs is of a magnitude far lesser than the charged offenses, which are extremely serious. *United States v. Pruett*, 681 F.3d 232, 245 (5th Cir. 2012). A limiting instruction could also appropriately address any concerns about prejudice.

### 2. Ortiz's 2020 and 2022 medical errors, including documents from disciplinary proceedings involving those medical errors that were pending at the time of the crimes in the indictment.

The government intends to present evidence of Ortiz's prior medical errors in November 2020 and May 2022. As described above, in November 2020, Ortiz was the anesthesiologist for a procedure at BSW North Garland during which a patient suffered

serious complications during anesthesia.  The Texas Medical Board inquiry into that incident was pending during the crimes charged in the indictment.

Also as described above, a second critical medical incident involving Ortiz occurred on May 19, 2022 at BSW Dallas.  That incident led to a disciplinary inquiry that was initiated days before the cardiac incidents at issue in the indictment.  The government may elicit testimony that Ortiz was informed of the disciplinary inquiry against him related to the May 19 incident on or around Tuesday, May 24, 2022, and the first cardiovascular incidents occurred on or around Thursday and Friday, May 26 and 27, 2022, later the same week.[2]  The government may also elicit testimony that Ortiz losing his job at BSW Dallas would have been (and was) financially devastating to Ortiz.

This is core intrinsic evidence, and therefore not subject to a Rule 404(b) analysis, because the prior medical errors (and/or the disciplinary investigations into them) overlap with the crimes charged in the indictment, complete the story of the crimes charged in the indictment, and show the circumstances under which Ortiz acted.  *Randall*, 887 F.2d at 1268.  The government's theory of the case—strongly supported by objective evidence—is that Ortiz began poisoning patients at BSW Dallas shortly after the investigation into the May 2022 incident occurred and almost immediately after Ortiz found out about it.  There is no way to explain that to the jury without discussing circumstances of the May 2022 incident at BSW Dallas.

---

[2] Further, Ortiz appeared at another meeting related to the May 19 incident on or around Wednesday, June 22, 2022, and there was a suspected cardiovascular incident the following week on or around Monday, June 27, 2022.

Government's 404(b) Notice – Page 10

Even if this evidence were subject to a Rule 404(b) analysis, it is properly admissible because it is substantially probative of Ortiz's intent, knowledge, and motive in committing the tampering and adulteration charges in the indictment. That is, the investigations into the medical errors and Ortiz's reaction to them provide a powerful motive for Ortiz to somehow take revenge on the center and/or to attempt to deflect attention away from his own errors.

3. **Ortiz's failure to pay taxes.**

The government intends to present evidence that, at the time of the crimes charged in the indictment, Ortiz owed millions of dollars to the IRS, his house was encumbered by a federal tax lien during the relevant period, and Collin County had sued Ortiz on multiple occasions to recover unpaid taxes. According to public records, the IRS has filed multiple federal tax liens on property belonging to Ortiz, including in August 2021 and January 2022. The government does not plan to dwell on this evidence, but will present it as part of Ortiz's motive to preserve his income from practicing medicine at BSW Dallas.

This evidence is intrinsic because it shows that Ortiz was in financial distress at the time of the crimes charged in the indictment, and therefore it "completes the story" of the crimes and shows "the circumstances under which [Ortiz] acted." *United States v. Gurrola*, 898 F.3d 524, 536 (5th Cir. 2018) (evidence is intrinsic if it "arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime of the trial.").

Even if this evidence is subject to a Rule 404(b) analysis, however, it passes that test because it shows Ortiz's motive. Indeed, Ortiz had a powerful motive to deflect attention away from his May 2022 medical error by making it look like other doctors were committing medical errors at BSW Dallas. That is, he wished to stave off losing his privileges at BSW Dallas so he could maintain his opulent lifestyle, despite his financial problems. The evidence of Ortiz's financial situation is probative of Ortiz's motive and admissible for a proper purpose under Rule 404(b).

### 4. Two similar poisonings at a different surgical center.

The government may elicit evidence and testimony that, days after the November 2020 error that Ortiz committed at BSW North Garland and then again days after that surgery center opened an investigation into the error, medical professionals there noted highly unusual medical complications during which patients in the pre-operative area experienced extreme hypertension and tachycardia after being attached to IV bags prior to their surgeries—almost exactly like the later victims at BSW Dallas. Those medical professionals will testify that Ortiz was at BSW North Garland at or around the time of those incidents.

These incidents easily pass the test for Rule 404(b) because they demonstrate a unique and unusual *modus operandi*, as well as "preparation, plan . . . identity, absence of mistake, [and] lack of accident." Ortiz's potential earlier dry run of poisoning patients at BSW North Garland after committing a grave medical error there—and then again after finding out about a disciplinary action there—belies any contention that the poisonings in the indictment at BSW Dallas were the work of anyone other than Ortiz, or that they were

the result of happenstance or misfortune. Nor will evidence about the prior poisonings cause undue prejudice because they are essentially part of the same criminal scheme as the charges in the indictment, so they will not independently or inappropriately "excite[]" the "emotions of the jury" given their similarity to other pieces of relevant evidence in the case. *United States v. Cockrell*, 587 F.3d 674, 679 (5th Cir. 2009) (affirming the admission of Rule 404(b) acts that were extremely similar to the charged conduct). Furthermore, the probative value of Ortiz committing other similar crimes with such a unique *modus operandi* is high, which counsels for this evidence's admission. *Id*.

### 5. Ten other cardiac incidents, and the death of Dr. Melanie Kaspar.

The government plans to introduce evidence of ten other suspected incidents between May and August 2022 where patients experienced unexpected cardiovascular complications, including the death of Dr. Melanie Kaspar. As alleged in the indictment, Dr. Kaspar, a 55-year-old who worked as an anesthesiologist at BSW Dallas, suffered cardiac arrest on June 21, 2022, approximately 30 minutes after administering IV fluids to herself at home. She died before emergency personnel arrived on the scene. There were no injuries to suggest a traumatic cause of death, no evidence that Dr. Kaspar had any underlying significant medical issues, and no gross anatomic findings on autopsy to explain her death. Dr. Kaspar sometimes used IV bags from work when she felt unwell and had tolerated them in the past.

Bupivacaine was found in her post-mortem toxicology analysis. Bupivacaine is not a drug of abuse, and according to medical professionals, it is highly unlikely that a medical professional would knowingly inject herself with bupivacaine intravenously.

The circumstances of her death did not indicate that she desired to commit suicide. The Dallas County Medical Examiners concluded that Dr. Kaspar died from the toxic effects of bupivacaine and the manner of death was a homicide.

Following the autopsy report on Dr. Kaspar's death, and the August 24, 2022 incident involving J.A., as charged in the indictment, BSW Dallas personnel identified that the incidents were likely not isolated and were part of a pattern of intentional adulteration of IV bags. BSW Dallas personnel determined that there were at least ten other suspected incidents between May and August 2022 where patients experienced unexpected cardiovascular complications during otherwise unremarkable surgeries. According to medical professionals, ten cardiac events during otherwise unremarkable surgeries at BSW Dallas is a high and unnatural number of anesthesia complications in such a short time period.

The incidents generally seemed to follow the same pattern—a patient's blood pressure would spike to dangerous levels at some point during the surgery, usually after the placement of a new IV bag. Typically, medical staff was able to save the lives of these patients only by using the "crash cart"—a set of emergency tools used when complications arise during surgeries—and by transferring the patients to emergency medical facilities. BSW Dallas personnel also determined that the cardiac incidents seemed to occur mostly during longer surgeries, when the patients required a second or subsequent IV bag retrieved from the "warmer."

The government intends to introduce evidence that, in addition to the events occurring on May 26, 27, and June 27 described above, the other cardiovascular incidents

involving suspected compromised IV bags occurred on or around July 7, 15, and 18. Ortiz performed services at BSW Dallas on or around—or on or around days leading up to—those days. Notably, Ortiz was on vacation from on or around July 23 until on or around July 28, 2022. No cardiovascular events occurred during this time, but did start occurring again after he returned to BSW Dallas on or around July 29, 2022; the first suspected incident thereafter occurred on or around August 1, 2022.

Because these episodes are charged in the indictment and are part of the same criminal episode as Ortiz's conduct charged in the indictment, this evidence is not subject to a Rule 404(b) analysis. The government includes them in this notice out of an abundance of caution. *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990). But even if the evidence about the other poisonings at BSW Dallas were subject to a Rule 404(b) analysis, the evidence would easily pass the test because they are offered for a proper purpose. That is, the pattern of incidents demonstrates the "identity" of the person responsible for the poisonings, as well as Ortiz's "opportunity" to commit the crimes. This evidence demonstrates that the poisonings began days after Ortiz was informed of the disciplinary inquiry into the May 2022 incident; they occurred on or around days that Ortiz worked at BSW Dallas; and they ceased while Ortiz was on vacation in late July 2022.

Respectfully submitted,

LEIGHA SIMONTON
United States Attorney

JOHN J. DE LA GARZA
Assistant United States Attorney
Texas State Bar No. 00796455
1100 Commerce Street, Suite 300
Dallas, Texas 75242
214-659-8838

s/ Patrick R. Runkle
PATRICK R. RUNKLE
Senior Litigation Counsel
RACHEL E. BARON
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC  20044-0386
202-532-4723

## CERTIFICATE OF SERVICE

I certify that on March 6, 2024, I electronically filed this document with the Clerk for the United States District Court for the Northern District of Texas pursuant to its electronic filing system (ECF). The ECF sent a "Notice of Electronic Filing" to the attorneys of record who have consented to accepting service via this method.

s/ Patrick R. Runkle
Patrick R. Runkle
Senior Litigation Counsel
