UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | 3:22-CR-378-N |
| § | |
| RAYNALDO RIVERA ORTIZ, JR, § | |

**MOTION FOR SANCTIONS**

Under *Brady* [*v. Marlyand*, 373 U.S. 383 (1963),] and its progeny, due process requires that the prosecution disclose evidence that is both favorable to the defendant and material to guilt or punishment." *Floyd v. Vannoy*, 894 F.3d 143, 161 (5th Cir. 2018). "This duty to disclose exists irrespective of a request from the defense, and extends to all evidence known not just to the prosecutors, but 'to the others acting on the government's behalf in the case, including the police.'" *Floyd*, 894 F.3d at 161 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976), and *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

This Court ordered the production of *Brady* material 35 days prior to trial, which in this case fell on February 26, 2024. E.C.F. doc. 47. On December 29, 2023, Dallas Police Department Forensic Fingerprint Expert Elizabeth Molina authored a report documenting her examination of latent fingerprints taken from IV bag evidence in this case. The IV bag presumably came from the surgery of J.A., a surgery referenced in the Indictment.[1] That report states that Ms. Molina was able to identify one print of value; that the print was, however, of insufficient quality to run through the AFIS database; that it may be of sufficient quality for comparison to known prints; and that the detective and/or the government could provide individual comparison prints for

---

[1] Relevant crime scene reports, ROIs, and/or chain of custody documents have not been provided to allow the defense to provide more specificity.

further examination. **The government timely produced this report, providing it to the defense on February 12, 2024.**

However, on January 8, 2024, Ms. Molina had authored a second report that detailed her comparison of the latent of value to the Defendant's known prints. That reports states that "Raynaldo Ortiz, Jr. was excluded as the source of latent print [examined]." On January 10, 2024, the examiner emailed Detective Watson, alerting her to the completion of the report and providing access thereto.

Subsequent to receiving the government's February 12, 2024, production of the first, inconclusive report, the undersigned sent a letter to the prosecutors on February 20, 2024, asking whether there were any additional reports or experts regarding the fingerprints. Exhibit A (counsel redacted the portions of this correspondence not pertaining to the instant issue). **On February 26, 2024, a prosecutor in this case denied knowledge of any further report regarding the fingerprint.** The letter said:

> We do not know of any additional reports concerning the fingerprinting, and we do not expect to list any fingerprint experts for testimony in the government's case-in-chief. We do reserve the right to call the DPD fingerprint expert in rebuttal, if necessary.

Exhibit B (counsel redacted the portions of this correspondence not pertaining to the instant issue).

**The United States Attorney's Office never turned over the January 8, 2024, report excluding the defendant as the source of the latent print.** Last Friday, the undersigned counsel obtained it directly from the print examiner.

This chain of events establishes a violation of the court's scheduling order. The material is plainly *Brady*. A fingerprint report excluding the Defendant from a print on the instrumentality of the crime is almost quintessentially favorable. *See Floyd*, 894 F.3d at 162-164.

2

Further, the report is of sufficient moment to qualify as material. The report shows that someone other than Defendant handled the IV bag and did so under conditions that permitted the development of a latent fingerprint. Of course, the fact that one person who handled the bag left a fingerprint does not necessarily imply that anyone else who did so would also leave a latent print. However, the development of a latent print is affected by the condition of the surface as well as the donor. *See* Brian Yamashita and Mike French, *Fingerprint Sourcebook*: *Ch. 7*, *Latent Print Development*, p. 7-4 (2011)("Transfer conditions also dictate whether a suitable impression will be left. These are the conditions of the surface (substrate) being touched, including texture, surface area, surface curvature or shape, surface temperature, condensation, contaminants, and surface residues."), *available at* https://www.ojp.gov/pdffiles1/nij/225327.pdf, last visited March 11, 2024. As such, the presence of another person's latent print on the bag at least increases the likelihood that the defendant would have left a print if he had touched the bag. And the fact that the print remains unidentified raises additional doubt about the prosecution's case.

Finally, the report appears to have been in the constructive possession of the prosecution. On January 10, 2024, the examiner notified a lead Detective in the State's parallel homicide investigation of its completion. Exhibit C. More importantly, emails between the Detective and the examiner makes clear that the reports originated from federal requests, and that the federal investigating agency had been in continuous contact with the Detective regarding the development and comparison of the prints. The email says:

> Seth told me you were running the fingerprints through AFIS. I was wondering if there were any prints back yet. Sorry to bother you. The FDA is asking me. This is part of a case that is set to go to trial in February.

Exhibit D. As such, the Detective is plainly part of the prosecution team for the purpose of the print inquiry, and her knowledge is imputed to the federal prosecutor. *See Kyles*, 514 U.S. at 437.

3

In short, this Court's order required production of this evidence. Yet, 58 days after the report's production to the Detective and 11 days after this Court's deadline, the prosecution still had yet to give it to the defense. Indeed, on the deadline, the prosecutor denied knowledge of the report.

The defense respectfully moves for appropriate sanction. "Any sanction imposed should be the least severe penalty necessary to ensure compliance with the court's discovery orders." *United States v. Dvorin*, 817 F.3d 438, 453 (5th Cir. 2016). There are two aspects to this standard: the sanction cannot be more severe than necessary, but it must be stern enough to ensure compliance with this Court's orders. That requires a measure of deterrence, and not merely the resolution of a single violation.

"The following factors should guide a district court's exercise of its discretion to impose sanctions for a discovery violation: '(1) the reasons why disclosure was not made; (2) the amount of prejudice to the opposing party; (3) the feasibility of curing such prejudice with a continuance of the trial; and (4) any other relevant circumstances.'" *Dvorin*, 817 F.3d at 453 (quoting *United States v. Garrett*, 238 F.3d 293, 298 (5th Cir.2000)). Application of these factors will likely demand a sanction.

The current record is not sufficiently developed as regards the first factor. The Court should hear evidence on this point.

The second and third factors weigh in favor of sanctions. Had the violation been discovered earlier, the defense could have sought an expert to assess the likelihood that a person who handled the bag would have left a latent print, given the known fact that someone who handled the bag did in fact leave a print. As it happens, however, the disclosure occurred after the defense's expert notice deadline. Further, the defense certainly would have filed a Notice of

4

Expert Testimony for Elizabeth Molina. The defense now has to file a Motion for Leave to File Out of Time to seek permission to add her as an expert witness for the defense.

Of course, the defense actually did independently discover the violation, which tends to mitigate the prejudice. But this will always be the case when the Court is in a position to sanction a discovery violation -- the Court does not sanction violations of which it is unaware. If anything, the means by which the discovery occurred weighs in favor of relief. In some cases, the prosecution itself will have brought a late disclosure to the attention of the defense and the prosecution. Here, however, the Court cannot be sure whether the disclosure would ever have been made without the defense's intervention, or at least it cannot be sure of this fact on the current record. In fact, the prosecutor affirmatively denied knowing that the report existed 47 days after it was disclosed to the prosecution team and has not yet disclosed it to the defense 21 days before trial is set to commence.

A continuance will not eliminate prejudice to the defense. Dr. Ortiz has been in pretrial custody for 18 months and desires a rapid resolution of his case. Extending his term of pretrial detention and delaying his opportunity for acquittal represents a form of prejudice, not an avoidance of it.

The most significant consideration in determining the appropriate response, however, falls within the fourth prong of this test: the discovery violation involved obviously favorable *Brady* material, rather than mere discoverable material under Rule 16.[2] *Brady* is a core protection against wrongful conviction, and of particular significance in a case that could produce a life sentence. Indeed, "[r]esearch has linked wrongful convictions to the failure to disclose exculpatory evidence, with an empirical study identifying *Brady* violations as one of nine

---

[2] Notably, the government continues to provide ordinary Rule 16 material. It sent another batch of Rule 16 documents this morning, without including the fingerprint report.

primary sources." John B. Gould, *et al*, *Mapping the Path of* Brady *Violations: Typologies, Causes & Consequences in Erroneous Conviction Cases*, 71 Syr. L. Rev. 1061, 1064 (2021) (citing Brian Gregory, Brady *is the Problem: Wrongful Convictions and the Case for "Open File" Criminal Discovery*, 46 U. S.F. L. Rev. 819, 821 (2012), Jon B. Gould, *et al*, *Predicting Erroneous Convictions*, 99 Iowa L. Rev. 471, 477 (2014), and J. Paul Johnson, *Study Reveals 10 Factors in Wrongful Conviction Cases*, Am. Univ. (Mar. 11, 2013), https://www.american.edu/media/news/spa_news_wrongful-convictions-study.cfm). *Brady* is a deadly serious matter, and this Court should treat it as such.

As such, the Defense requests that the Court convene a hearing at which it may receive evidence regarding the circumstance of the government's non-disclosure. It further requests that the Court consider the following relief, in descending order of preference:

1. dismissal of the Indictment;
2. preclusion of any evidence obtained during or regarding the cardiac event that occurred during the surgery of Mr. Alderstein;
3. issuance of a Jury Instruction informing the jury that material and favorable evidence had been suppressed by the prosecution and/or investigating officer, and that it should draw an unfavorable inference toward the prosecution, which inference may alone be sufficient to acquit the defendant;
4. issuance of a Jury Instruction telling the jury that if it finds that material and favorable evidence has been suppressed, it may draw an unfavorable inference toward the prosecution, which inference may alone be sufficient to acquit the defendant;
5. admission of evidence from the defense regarding the suppression of the evidence;

6. appointment of a special master to audit the government's production of discovery material;

7. a requirement that supervisory attorneys in the United States Attorney's Office attest that they have reviewed the evidence in the case and can confirm that all discoverable material has been produced;

8. permission to the defense to present unnoticed experts, or to give notice after the deadline;

9. such other relief as may be necessary to enforce the Court's order.

## CONCLUSION

The defense respectfully moves for a pre-trial hearing for the relief discussed herein.

Respectfully submitted,

*/s/ John M. Nicholson*
JOHN M. NICHOLSON
Assistant Federal Public Defender
Northern District of Texas
Texas Bar # 24013240
525 Griffin Street, Suite 629
Dallas, Texas 75202
Phone (214) 767-2746
Fax (214) 767-2886
john_nicholson@fd.org

*s/ Marti R. Morgan*
MARTI R. MORGAN
Assistant Federal Public Defender
Northern District of Texas
Florida Bar # 91879
525 Griffin Street, Suite 629
Dallas, Texas 75202
Phone (214) 767-2746
Fax (214) 767-2886
marti_morgan@fd.org

## **CERTIFICATE OF SERVICE**

      I hereby certify that on March 11, 2024, I electronically filed the foregoing document using the Court's CM/ECF system, thereby providing service on attorneys of record.

                                          */s/ John M. Nicholson*
                                          JOHN M. NICHOLSON